UNITED STATES of America,
Plaintiff–Appellee,

and

Yonkers Branch–National Association For the Advancement of Colored People et al., Plaintiffs–Intervenors–Appellees,

v.

CITY OF YONKERS,
Defendant–Contemnor–Appellant,

Yonkers Board of Education and Yonkers Community Development Agency, Defendants.

In the Matter of Henry SPALLONE, Peter Chema, Nicholas Longo, and Edward Fagan, Contemnors–Appellants.

Nos. 1679–1682, Dockets 88–6178, 88–6184, 88–6188 and 88–6190.

United States Court of Appeals, Second Circuit.

Argued Aug. 17, 1988.

Decided Aug. 26, 1988.

Michael W. Sculnick, New York City (Stanley R. Strauss, Vedder, Price, Kaufman, Kammholz & Day, New York City, Rex E. Lee, Carter G. Phillips, Sidley & Austin, Washington, D.C.; Paul W. Pickelle, Corp. Counsel, Yonkers, N.Y., on the brief), for defendant-contemnor-appellant.

Anthony J. Mercorella, New York City (Vincent R. Fontana, James L. Fischer, Vincent R. Cappucci, Wilson, Elser, Moskowitz, Edelman & Dicker, New York City, on the brief), for contemnor-appellant Spallone.

James D. Harmon, Jr., New York City (Barry G. Saretsky, Martin S. Kaufman, Michael J. Eng, Aaron F. Fishbein, Bower & Gardner, New York City, on the brief), for contemnor-appellant Chema.

Lawrence R. Sykes, Yonkers, N.Y., for contemnors-appellants Longo and Fagan.

Linda F. Thome, Dept. of Justice, Washington, D.C. (Wm. Bradford Reynolds, Asst. Atty. Gen., Mark R. Disler, Deputy Asst. Atty. Gen., David K. Flynn, Dept. of Justice, Washington, D.C., on the brief), for plaintiff-appellee.

Michael H. Sussman, Yonkers, N.Y. (Sussman & Sussman, Yonkers, N.Y., on the brief), for plaintiffs-intervenors-appellees.

Before NEWMAN, MINER and MAHONEY, Circuit Judges.

JON O. NEWMAN, Circuit Judge:

This appeal presents important issues concerning the enforcement of orders of a

United States District Court requiring action by a municipality to remedy violations of the Constitution and statutes of the United States. The principal issues are whether members of the Yonkers City Council may be required to vote to implement remedies contained in a consent judgment agreed to by the City and approved by the City Council, and whether the City, in addition to the council members, may be subjected to the coercive sanctions of civil contempt when the agreed upon legislative action has not been taken. The issues arise on appeals by the City of Yonkers and four members of the Yonkers City Council from orders of the District Court for the Southern District of New York (Leonard B. Sand, Judge) adjudicating the City and the council members in civil contempt and imposing coercive sanctions. We conclude that under the circumstances of this case the recalcitrant council members may be required to vote to implement the consent judgment and that the City, in addition to the council members, may be adjudicated in contempt and subjected to coercive sanctions for failure to abide by the consent judgment and subsequent implementing orders of the District Court. We also conclude that the amount of the monetary sanctions imposed on the City, though properly substantial, should be somewhat reduced. We therefore affirm the order adjudicating the council members in contempt and affirm, as modified, the order adjudicating the City in contempt.

## Background

### 1. The Underlying Lawsuit

The United States filed the underlying lawsuit on December 1, 1980, against the City of Yonkers, the Yonkers Community Development Agency, and the Yonkers Board of Education. The complaint made two basic allegations: (a) that the City and the Community Development Agency had "intentionally ... perpetuated and seriously aggravated residential racial segregation" in violation of the Constitution and Title VIII of the Civil Rights Act of 1968,

42 U.S.C. §§ 3601–3619 (1982), and (b) that the racial segregation in the City's public schools had been "caused in substantial part by intentional, racially discriminatory acts and omissions" of the City and the Board of Education in violation of the Constitution. The National Association for the Advancement of Colored People (NAACP) was granted leave to intervene, and the suit was subsequently certified as a class action on behalf of all Black residents of Yonkers who currently reside in or are eligible to reside in publicly assisted housing or who are parents of children attending Yonkers public schools.

After a bench trial lasting ninety days over the course of fourteen months in 1983 and 1984, the District Court found the City and the Community Development Agency liable for intentional housing segregation and found the City and the Board of Education liable for intentional school segregation. *United States v. Yonkers Board of Education*, 624 F.Supp. 1276–1553 (S.D.N.Y.1985). With respect to the housing violations, with which we are concerned on this appeal, the District Court found that the City had deliberately concentrated virtually all of its public and other subsidized housing in the southwest quadrant of Yonkers and had done so to maintain residential segregation. *Id.* at 1372–76. After conducting a six-day hearing as to appropriate remedies, the District Court issued a Housing Remedy Order on May 28, 1986. *United States v. Yonkers Board of Education*, 635 F.Supp. 1577 (S.D.N.Y.1986).[1]

The Housing Remedy Order included provisions for the construction of 200 units of public housing and for the planning of additional units of subsidized housing. The City had previously agreed to provide acceptable sites for the 200 units of public housing as a condition of receiving its 1983 Community Development Block Grant from the United States Department of Housing and Urban Development (HUD). Part IV of the Housing Remedy Order established a precise timetable within which the City was required to furnish HUD with neces-

---

**1.** An order providing a remedy for the school segregation violation was issued May 13, 1986.

*United States v. Yonkers Board of Education*, 635 F.Supp. 1538 (S.D.N.Y.1986).

sary documents to secure HUD's approval of funds for the 200 units. *Id.* at 1580–81. The City was required to propose sites for 140 units within thirty days and sites for the remaining 60 units within ninety days.

Part VI of the Housing Remedy Order accorded the City broad discretion to make its own determinations concerning additional units of subsidized housing. The District Court did not specify the number of units to be built, the time by which they must be built, or the degree of subsidization. Part VI contained essentially two requirements. First, the additional units must be located in existing residential areas in east or northwest Yonkers. Second, the City must prepare a plan specifying, among other things, the number of subsidized units to be constructed or acquired, their location, and the rent levels or degree of subsidization. *Id.* at 1582. The City was given until November 15, 1986, nearly six months, to present its plan.

This Court affirmed the liability and remedy rulings of the District Court on December 28, 1987. *United States v. Yonkers Board of Education*, 837 F.2d 1181 (2d Cir.1987), and the Supreme Court denied the City's petition for a writ of certiorari. —— U.S. ——, 108 S.Ct. 2821, 100 L.Ed.2d 922 (1988). None of the requirements of the Housing Remedy Order was stayed during the course of appellate review.

### 2. Attempts to Implement the Housing Remedy Order

With respect to the requirement to propose sites for the 200 units of public housing within thirty and ninety days, the City totally defaulted. No site was proposed. With respect to the requirement to submit a plan within six months for additional subsidized housing, the City again totally defaulted. On the appointed day, November 15, 1986, the City informed the District Court that it would not comply. The United States and the NAACP then moved for an adjudication of civil contempt and the imposition of coercive sanctions. Rather than proceed immediately to consideration of contempt sanctions, the District Court patiently endeavored to secure voluntary compliance. In February 1987, the City Council agreed to the appointment of an Outside Housing Advisor to identify sites for the 200 units of public housing and to draft a long-term plan for the additional units of subsidized housing. Throughout the rest of 1987 attention was focused primarily on the requirement for proceeding with the 200 units of public housing. The Advisor recommended placing the 200 units in small clusters on scattered sites. In April 1987, the City Council proposed to place the 200 units on twelve sites but rendered the proposal illusory by conditioning it on the patently unacceptable right of local civic associations to select the tenants. By the end of 1987 the City had taken no significant action to comply with the 1986 Housing Remedy Order.

In January 1988, following this Court's affirmance of the liability and remedy decisions and with the District Court contemplating designation of sites for the 200 units, the parties began negotiations to settle the compliance issues. On January 19, when prospects for agreement appeared bleak, the District Court pointed out to the City that the Court could proceed either by "deeming things to have been done which it was the obligation of Yonkers to do, or it can order Yonkers to do those things." On January 25, counsel for the City informed the Court that the City was contemplating a consent judgment and that the City was prepared to designate seven sites for the 200 units of public housing and to implement a long-term plan to achieve the goal of 800 units of subsidized housing that had been recommended by the plaintiffs. A consent decree was agreed to by the parties that same day, approved by the City Council on January 27, and entered as a consent judgment of the District Court on January 28 ("the Consent Judgment").

With respect to the 200 units of public housing, the Consent Judgment renewed the City's commitment to build the units and identified seven specific sites. The judgment also committed the City to take specific steps within a prescribed timetable to have the 200 units built. Finally, the City pledged that it would not seek further review of the District Court's 1986 decision

or any subsequently entered decree to the extent that such decrees relate to the 200 units.

With respect to the 800 units of subsidized housing, the Consent Judgment included several provisions, which are at the core of the pending appeal. First, the City acknowledged that the goal of 800 units was "an appropriate target in fulfilling its obligations pursuant to Part VI" of the Housing Remedy Order. Consent Judgment § 12. Next, the City pledged to make good-faith efforts to achieve 600 of the units in annual installments of 200 units within each of the next three years. *Id.* Next, and of special significance, the City agreed to adopt "legislation" on a number of topics to facilitate meeting the goal of 800 units of subsidized housing. *Id.* § 17. Among other things, the City agreed to adopt legislation granting necessary tax abatements, providing for zoning changes, and establishing, within ninety days, a package of incentives for local development. *Id.* § 17(b), (d), (e). Finally, the City agreed with the other parties to work diligently to agree on various unresolved matters primarily concerning financial aspects of the 800 units and to submit a second consent decree to the Court by February 15, 1988. *Id.* § 18.

Rather than abide by the terms of the Consent Judgment, the City promptly attempted to disavow it. Citing intense community opposition to the Consent Judgment, especially the public housing provisions, the City moved on March 21, 1988, to delete the provision in which it had agreed not to seek further appellate review concerning the obligation to build the 200 units. To demonstrate the lengths to which it was prepared to go to be relieved of its public housing commitment, the City offered to return approximately $30 million of federal funds in the event the Supreme Court should set aside the public housing provisions of the Housing Remedy Order. The City's motion to amend the Consent Judgment was denied on March 31, and that ruling has not been appealed.

On April 12, at a chambers conference with the District Court, the City announced that it was "not interested" in completing negotiations on the terms of a long-term plan for the 800 units of subsidized housing, as required by section 18 of the Consent Judgment. In light of this development, the United States and the NAACP submitted to the Court on May 2 a proposed Long Term Plan Order based largely on a draft that had been prepared by the City's lawyers during the negotiations that had ensued prior to April 12. The City opposed the proposed order and noted specific objections. The District Court directed the plaintiffs to revise their proposed Long Term Plan Order in light of the City's objections. On June 13, following a hearing and further changes, the District Court entered the Long Term Plan Order. As revised by the parties and by the Court, the Long Term Plan Order accommodated most of the City's objections. The Order provided considerable detail for the legislation that the City had committed itself to adopt in section 17 of the Consent Judgment.

By the time the Long Term Plan Order was entered, the City was one month in default on the obligation, agreed to in the Consent Judgment, to adopt implementing legislation. The United States therefore asked the Court to set a timetable for enactment of the legislation. On June 21 counsel for the City informed the Court that a consulting firm had been retained to draft the legislation and that City Council action could be anticipated at the next council meeting, perhaps in August. Concerned about the prospect of delay, a concern heightened by the City Council's adoption on June 14 of a resolution declaring a moratorium on all public housing in Yonkers, the District Court requested that the City Council pass a resolution adopting the provisions of the Long Term Plan Order. On June 28 the City Council voted against a resolution "indicating [the Council's] commitment to the implementation of" the Housing Remedy Order, the Consent Judgment, and the Long Term Plan Order.

The following day the District Court directed the plaintiffs to submit an order requiring the City to take "specific implementing action" under a prescribed timetable, violation of which would subject the

City to contempt sanctions. In response to the plaintiffs' proposed order setting forth such a timetable, the City argued that the defeat of the resolution on June 28 indicated that the City would not voluntarily adopt legislation contemplated by the Long Term Plan Order and suggested that the Court itself should enter an order adopting the necessary legislation. At a hearing on the proposed timetable on July 12, the District Court invited the parties' comments on the possible creation by the Court of an Affordable Housing Commission to exercise the City Council's functions concerning implementation of the housing remedy orders. The City opposed creation of the Commission because it would divest the Council of its "core legislative as well as executive functions."

### 3. The Prospect of Contempt

Prior to this point in the litigation, the District Court had on at least two occasions warned the City that it would face a contempt adjudication and coercive sanctions if it failed to abide by the Consent Judgment. On July 26 the District Court issued an order that gave the City one final opportunity to comply and detailed the precise consequences of continued noncompliance. The July 26 order required the City to enact by August 1 "the legislative package relating to the long-term plan as described in Section 17 of the [Consent Judgment] and the Long Term Plan Order." The "legislative package" was set forth in a detailed Affordable Housing Ordinance, which had been drafted by the City's consultants and marked as an exhibit at the July 26 hearing.

The July 26 order also established the schedule and consequences of civil contempt proceedings to occur in the event that the legislation was not adopted by August 1. If that occurred, the City and the council members were to show cause at 10:00 a.m., August 2, why they should not be adjudged in contempt. If such cause was not shown, each council member failing to vote for such legislation would be fined $500 per day, and, if the legislation was not passed by August 10, such council member would be imprisoned on August

11. The contempt sanction against the City would be daily fines starting at $100 on August 2 and doubling in amount each day of continued noncompliance. The cumulative total of the fines against the City would exceed $10,000 by day 7, exceed $1 million by day 14, exceed $200 million by day 21, and exceed $26 billion by day 28. The order provided that a council member could be purged of contempt by voting in favor of the legislation or by enactment of the legislation. The City could be purged of contempt by enactment of the legislation. The order further provided that all fines would be paid into the Treasury of the United States and would not be refundable, that the Council would meet at least once a week to vote on the legislative package, and that any incarcerated council member would be released to attend such meetings.

On July 28, the District Court informed all counsel by letter that the July 26 order "will be satisfied if the City Council, on or before August 1st, adopts a resolution committing itself to enact the Affordable Housing Ordinance within the minimum time prescribed for notice pursuant to state law." This letter responded to the City's expressed concern that state law specified notice and public hearing requirements in connection with enactment of zoning ordinances.

On August 1, the City Council met to consider a resolution expressing the Council's intent to adopt the Affordable Housing Ordinance within the minimum time prescribed by state law. The Council defeated the resolution by a vote of four to three.

### 4. The Contempt Adjudications

As contemplated by the July 26 order, the District Court held a hearing on August 2 to afford the City and the council members an opportunity to show cause why they should not be adjudicated in civil contempt. Counsel for the City reported that the City Council had taken two actions the previous night. First, the Council had scheduled a public hearing for August 15, thereby giving the required state law no-

tice of a hearing on a proposed zoning ordinance. Second, the Council had defeated the resolution of intent to adopt the Affordable Housing Ordinance. With respect to contempt, the City made essentially three points. First, counsel argued that the City was powerless to compel the dissenting council members to vote in favor of the Affordable Housing Ordinance. Second, he urged the Court to order the legislation into effect, rather than hold the City in contempt. Third, he pointed out that the fines were punitive since the escalating amount of the fines would place the City in bankruptcy in three weeks.

The District Court rejected these contentions. The Court noted that the City had failed to discharge its responsibilities to comply with the orders of the Court. The City had not applied to the Emergency Financial Control Board to take action or requested action by the Governor of New York. The Control Board was created to oversee Yonkers' financial condition and has an array of powers with respect to the City's financial affairs. 1984 N.Y.Laws ch. 103. Under the Yonkers City Charter, any elected officer may be removed from office by the Governor for "misconduct." Yonkers City Charter § C(2)–5. The Court was informed that the City had requested the Governor to use his "good offices" but had not requested him to "exercise powers and responsibilities he has as the governor of the state under the circumstances that now obtain." The Court also pointed out that by offering to have judgment of approximately $30 million entered against it as a means of avoiding its long-standing commitment to build the 200 units of public housing, the City had "crossed the line of any form of fiscal or other governmental responsibility."

Concerning the suggestion that the Court, rather than the City, adopt the Affordable Housing Ordinance, the Court observed:

> [Th]ere does have to come a moment of truth, a moment of reckoning, a moment when the City of Yonkers seeks not to become the national symbol of defiance to civil rights and to heap shame upon shame upon itself, but to recognize its

obligation to conform to the laws of the land and not step by step, order by order, but in the way in which any responsible community concerned about the welfare of its citizens functions. That is not going to be accomplished by this court adopting the ordinance.

Finally, the Court rejected the claim that the contempt sanctions were punitive:

> What could be more remedial and less punitive than a fine schedule that begins at $100 a day? $100 for the first day is not going to bankrupt Yonkers. $200 for the second day is not going to bankrupt Yonkers. The dire picture that you paint supposes: A that the contempt continues; and B that no other agency intervenes. As I have said on a number of occasions, this court is not the only entity which is bound by oath to protect and defend the constitution.

The Court held the City in contempt, imposed the coercive sanctions set forth in the July 26 order, and entered written findings of fact.

The District Court then considered the four council members who had voted against the resolution of intent to adopt the Affordable Housing Ordinance, Nicholas Longo, Edward Fagan, Peter Chema, and Henry Spallone. Counsel for Longo and Fagan requested an adjournment to familiarize himself with the case. The District Court denied the request, expressing the view that the council members had been on notice since July 26 of the prospect they faced and the need to have counsel. The Court stated that it would proceed with the contempt adjudication but would afford counsel the opportunity at a later time to be heard with respect to any theory or circumstance not available at this time. Counsel then asserted that his clients had not acted in bad faith and contended that they had opposed the resolution of intent because adoption of the Affordable Housing Ordinance would have violated state law requirements for notice and hearing of zoning changes. When the Court inquired whether counsel was representing that but for the claimed procedural defect, the coun-

cil members would have voted for the resolution, no such assurance was given. Nor was such assurance given when Longo and Fagan each addressed the Court directly.

Counsel for Chema requested a two-week adjournment, which was denied. The District Court again stated its determination to proceed that day but afforded counsel the opportunity to reopen the matter thereafter. The Court also offered the opportunity for an immediate evidentiary hearing, which was declined. The Court then ascertained from Chema that he had received notice of the July 26 order and had voted against the resolution of intent the previous evening.

The District Court found Longo, Fagan, and Chema in contempt and imposed the sanctions set forth in the July 26 order. The Court also stated that, if any contemnor wished an evidentiary hearing, such request should be made by August 5 and that a hearing, if requested, would be held August 8. The Court again stated that "to obviate this question of state law and the dates contained in the state law provision" a vote in favor of a resolution of intent would constitute a purging of the contempt.

The fourth council member, Spallone, appeared without counsel and requested and was granted 24 hours to retain counsel. Spallone appeared with counsel at a hearing on August 4. At that time his counsel acknowledged that there was no factual issue in dispute. Counsel contended that his client could not be found in contempt because a legislator had an "unfettered" right to vote as he wishes. Counsel also urged that if the Court's order was violated, "it was done by the coun[ci]l corporate body per se." Finally, reversing the contention of the City, he urged the Court to "[p]unish the City of Yonkers, but don't punish my client."

The District Court found Spallone in contempt and made the finding retroactive to August 2.[2] By August 5 all four council members had informed the District Court that no evidentiary hearing was sought.

The District Court denied requests for stays by the City and the four council members. On August 9, after fines for seven days had become due, this Court stayed the contempt sanctions and ordered an expedited appeal. At the hearing of that appeal on August 17, the Court was informed that the public hearing noticed by the City Council on August 1 had been held on August 15. We were also informed that at the August 15 meeting the Council voted against the Affordable Housing Ordinance by a vote of four to three.

Discussion

A. *The Council Members*

1. Procedural Objections

■ The four council members contend that their contempt adjudications occurred without observance of the procedural protections of the Due Process Clause and those normally required for civil contempt proceedings. They contend that the proceedings were not initiated by orders to show cause, that they received inadequate notice of the charges, that their counsel were denied a reasonable time to prepare their defense, that issues concerning intent were not sufficiently explored, that the United States was not obliged to sustain its burden of proof, and that the judgments of contempt fail to identify the precise order violated.

■ A person charged with civil contempt is entitled to notice of the allegations, the right to counsel, and a hearing at which the plaintiff bears the burden of proof and the defendant has an opportunity to present a defense. *See In re Kitchen*, 706 F.2d 1266 (2d Cir.1983); *In re Rosahn*, 671 F.2d 690 (2d Cir.1982); *In re Di Bella*, 518 F.2d 955 (2d Cir.1975); *see also* Rule 43(a) of the Rules of the Southern and Eastern Districts of New York.

With one exception, procedural requirements were fully observed. The order of July 26 served as a show cause order, giving the council members notice that in

---

2. Spallone has not challenged on appeal the retroactive aspects of the civil contempt sanc-

tion imposed upon him, and we decline to consider the issue *sua sponte*.

the event of a failure to comply with the requirements of that order, they would be obliged to show cause why they should not be adjudicated in contempt for such failure. The order went even further than required by alerting the council members beforehand as to the precise sanctions that would be imposed in the event of noncompliance. Though the council members were not then defendants in the litigation, as officers of the defendant City, *see* N.Y.Pub.Off.Law § 2 (McKinney 1988), they were bound by that order and all of the injunction orders issued against the City, *see* Fed.R.Civ.P. 65(d), even without notice of them, *Dole Fresh Fruit Co. v. United Banana Co.,* 821 F.2d 106, 109 (2d Cir.1987). In any event, the District Court required the City to post the July 26 order conspicuously, and none of the council members contends that he was not aware of its requirements.

Each council member appeared with counsel, and each was accorded an opportunity to present evidence and legal argument. The need for the plaintiffs to present evidence to sustain their burden of proof was obviated by the City's representation, undisputed by any of the four council members, that each had voted against the resolution of intention at the August 1 meeting of the City Council. As to the alleged lack of precision as to the precise order violated, the District Court's oral and written rulings specify that the council members are adjudged in contempt for violation of the July 26 order. Defendants contend that they are uncertain whether they have been cited for failing to vote in favor of the Affordable Housing Ordinance or for voting against the resolution of intention to adopt that ordinance. The action required of them by the July 26 order was to vote in favor of the Affordable Housing Ordinance. They failed to do so on August 1 and were found to be in contempt for that failure. The resolution of intention was a device offered by the District Court as a means of satisfying the July 26 order while still observing the notice and hearing time requirements of state law. The vote against that resolution was clear evidence that the four council members were unwilling to obey the requirements of the July 26 order.

■ Of more substantial concern is the complaint that counsel were given inadequate time to present a defense. We are not persuaded by the District Court's point that the order of July 26 provided the council members time to retain counsel and time for counsel to become prepared in the event that noncompliance occurred on August 1. A council member is not obliged to retain counsel in advance of the occasion when his action may subject him to contempt, especially in the circumstances of this case, where the affirmative vote of any one of the four council members would have meant that none faced contempt.

■ We think it would have been preferable, even in the face of the protracted defiance demonstrated on this record, for the District Court to have accorded counsel at least a few days to prepare their defenses. Nevertheless, we see no basis for concluding that the promptness of the adjudications warrants setting them aside. None of the four contemnors sought the opportunity that was afforded them of pursuing an evidentiary hearing. There were no factual disputes to be resolved. Counsel were impaired, at most, in their ability to develop their contentions of law. Since, as will appear, we agree that all such contentions, now fully briefed and argued, are without merit, it would be idle to return the matter to the District Court to renew rulings that we are today holding were entirely correct.

2. Abuse of Discretion

■ In different ways the council members contend that the District Court exceeded its discretion in adjudicating them in contempt. One argument is that the Court on July 26 should not have directed the council members to vote for the Affordable Housing Ordinance once the Council had defeated an earlier resolution of intention on June 28. Another argument is that once the vote of August 1 occurred, the Court should not have adjudicated the council members in contempt. Underlying both arguments is the contention that a less confrontational resolution of the mat-

ter could have been achieved had the District Court selected the alternatives of either appointing a commission to exercise the Council's housing and related powers or ordering the Affordable Housing Ordinance into effect.

 These arguments blend two somewhat different propositions of law, but in the end, both are unavailing. In challenging the District Court's decision to require the Council to enact the Affordable Housing Ordinance, the contemnors are alleging an abuse of discretion in the Court's choice of remedies for the constitutional violations adjudicated in 1986. As the contemnors point out, a District Court, though endowed with broad discretion in fashioning remedies for constitutional violations, *see* *Swann v. Charlotte–Mecklenburg Board of Education*, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), must exercise restraint in determining what actions ought to be required of state and local governmental officials. *See Rizzo v. Goode*, 423 U.S. 362, 380, 96 S.Ct. 598, 608, 46 L.Ed.2d 561 (1976); *Toussaint v. McCarthy*, 801 F.2d 1080 (9th Cir.1986), *cert. denied,* — U.S. ——, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987); *Ruiz v. Estelle*, 679 F.2d 1115 (5th Cir. 1982), *cert. denied,* 460 U.S. 1042, 103 S.Ct. 1438, 75 L.Ed.2d 795 (1983). In challenging the District Court's decision to impose coercive contempt sanctions, the contemnors are alleging an abuse of discretion in the Court's method of enforcing the remedy that had been selected. Though there is no question that courts have authority to enforce their lawful orders through civil contempt, *Shillitani v. United States*, 384 U.S. 364, 370, 86 S.Ct. 1531, 1535, 16 L.Ed. 2d 622 (1966), the contemnors properly point out that in selecting contempt sanctions, a court is obliged to use the " 'least possible power adequate to the end proposed.' " *Id.* at 371, 86 S.Ct. at 1536 (quoting *Anderson v. Dunn,* 19 U.S. (6 Wheat.) 61, 69 (1821)).

In this case, however, there is a fundamental reason why the choice of implementing legislation as a remedy and the choice of coercive contempt sanctions to enforce compliance with that remedy cannot possibly be an abuse of the District Court's discretion. That reason is the blunt fact that the City agreed in the Consent Judgment to comply with the Housing Remedy Order by the adoption of necessary implementing legislation, specifically including tax abatements and zoning changes. By its approval of the Consent Judgment the City Council itself selected the remedy of implementing legislation and cannot complain that the District Court approved the agreement. Moreover, once committed by its own agreement to adopting implementing legislation, the Council cannot complain that its obligation is enforced by the coercive sanctions of civil contempt. Consent judgments are important devices for resolving difficult controversies. Their effectiveness depends on the ability of all concerned to rely on the enforcement of their terms. In the context of a consent judgment, use of civil contempt sanctions is the "least possible power *adequate* to the end proposed" because faithful performance of the agreement is precisely the end proposed.

To the extent that the council members are contending that the District Court exceeded its discretion in ordering them to adopt the precise terms of the Affordable Housing Ordinance, this argument also is unavailing. The Consent Judgment had obliged the City not only to enact implementing legislation but to furnish within three weeks a long-term plan spelling out the details on matters left unresolved in the consent judgment. Upon the City's default of that obligation, the District Court was fully entitled to proceed with efforts to formulate a long-term plan. The Court proceeded cautiously, according the City a full opportunity to draft the plan and ultimately accepting nearly everything that the City proposed. Similarly, with the specifics of the Affordable Housing Ordinance, the District Court afforded the City the opportunity to have its consultants draft the ordinance and accepted the draft they produced. By ordering passage of the Affordable Housing Ordinance, the District Court was carrying out the terms of the Consent Judgment under which the City agreed to adopt implementing legislation

on tax abatements and zoning changes and doing so with details supplied by the City itself. The order of July 26 was well within the discretion of the District Court, as was its decision to enforce that order by civil contempt sanctions.

### 3. State Law Objection

██ Council member Chema contends that the order of July 26 cannot be enforced by contempt sanctions because it violates state law requiring notice and hearing of proposed changes in zoning ordinances. N.Y.Gen.City Law § 83 (McKinney 1968). The argument is unavailing. In the first place, the supremacy of federal law, including federal court orders to implement remedies for federal constitutional and statutory violations, prevails over conflicting state laws. See Cooper v. Aaron, 358 U.S. 1, 78 S.Ct. 1401, 3 L.Ed.2d 5 (1958). Moreover, the District Court made clear in its letter to counsel of July 28 that the order of July 26 would be satisfied if the Council "adopts a resolution committing itself to enact the Affordable Housing Ordinance within the minimum time prescribed for notice pursuant to state law." This alternative means of compliance with the July 26 order was reiterated in the August 2 hearing at which the council members were adjudicated in contempt.

It may be contended that by requiring a resolution of intention by August 1, prior to the August 15 hearing on the Ordinance, the District court was observing the notice requirement of state law but overriding the substance of the hearing requirement by ordering the Council to commit itself to an Ordinance before it had the benefit of input from the public. We do not understand the District Court to have simultaneously permitted time for the public hearing and also precluded consideration of its results. Obviously, the basic issue of adopting an ordinance that implemented the Housing Remedy Order, the Consent Judgment, and the Long Term Plan Order had been determined and would not be open for reconsideration as a result of the public hearing. To that extent, the state law hearing requirement was properly overridden by paramount federal law. But there is no rea-

son to believe that the District Court intended to bar consideration by the Council of useful suggestions tendered at the public hearing that might improve specific provisions of the Affordable Housing Ordinance. The hearing would still be useful to the extent that it generated suggestions not inconsistent with achieving the basic objectives of the remedial orders that had been entered. The Council has at all times been free to seek modification of the terms of the proposed ordinance, which the City's consultants drafted, but no such request has been made. Finally, we note that after the public hearing was held on August 15, the four individual contemnors again voted against the Affordable Housing Ordinance.

### 4. Legislative Immunity

██ The major defense asserted by the council members is that they are entitled to legislative immunity and that such immunity prohibits a district court from compelling them to vote in favor of a particular ordinance. There is no doubt that state legislators enjoy immunity when engaged "in the sphere of legitimate legislative activity." Tenney v. Brandhove, 341 U.S. 367, 376, 71 S.Ct. 783, 788, 95 L.Ed. 1019 (1951); see Supreme Court of Virginia v. Consumers Union of the United States, Inc., 446 U.S. 719, 731–33, 100 S.Ct. 1967, 1974–75, 64 L.Ed.2d 641 (1980). The Supreme Court has extended such immunity to "regional legislators," Lake Country Estates, Inc. v. Tahoe Regional Planning Agency, 440 U.S. 391, 99 S.Ct. 1171, 59 L.Ed.2d 401 (1979), but has expressly left open the question whether such immunity extends to "individuals performing legislative functions at the purely local level," id. at 404 n. 26, 99 S.Ct. at 1178 n. 26. Prior to Lake Country Estates, a number of circuits had denied immunity to local legislative officials, see Williams v. Anderson, 562 F.2d 1081, 1101 (8th Cir.1977) (school board members); Jones v. Diamond, 519 F.2d 1090, 1101 (5th Cir.1975) (county supervisors); Curry v. Gillette, 461 F.2d 1003, 1005 (6th Cir.) (aldermen), cert. denied, 409 U.S. 1042, 93 S.Ct. 529, 34 L.Ed. 2d 492 (1972); Progress Development

*Corp. v. Mitchell,* 286 F.2d 222, 231 (7th Cir.1961) (village board of trustees); *Cobb v. City of Malden,* 202 F.2d 701, 706–07 (1st Cir.1953) (Magruder, C.J., concurring) (city councilmen), but after the Supreme Court extended immunity to regional legislators, seven circuits ruled that similar immunity is available to local legislators, *see Aitchison v. Raffiani,* 708 F.2d 96, 98–100 (3d Cir.1983); *Reed v. Village of Shorewood,* 704 F.2d 943, 952–53 (7th Cir.1983); *Espanola Way Corp. v. Meyerson,* 690 F.2d 827 (11th Cir.1982), *cert. denied,* 460 U.S. 1039, 103 S.Ct. 1431, 75 L.Ed.2d 791 (1983); *Kuzinich v. County of Santa Clara,* 689 F.2d 1345, 1349–50 (9th Cir. 1982); *Hernandez v. City of Lafayette,* 643 F.2d 1188, 1193–94 (5th Cir. Unit A 1981), *cert. denied,* 445 U.S. 907, 102 S.Ct. 1251, 71 L.Ed.2d 444 (1982); *Bruce v. Riddle,* 631 F.2d 272 (4th Cir.1980); *Gorman Towers v. Bogoslavsky,* 626 F.2d 607, 611–14 (8th Cir.1980).

Even if we assume for purposes of this appeal that city council members enjoy the same immunity available to state legislators, we would seriously doubt that such immunity insulates them from district court orders requiring them to comply with remedial decrees redressing constitutional violations. The Supreme Court has instructed a district court that, if necessary to secure compliance with a prior federal court remedial decree, it could order county legislators "to exercise the power that is theirs to levy taxes" to reopen the public schools of Prince Edward County, Virginia. *Griffin v. County School Board,* 377 U.S. 218, 233, 84 S.Ct. 1226, 1234, 12 L.Ed.2d 256 (1964). Though appellants minimize the force of this instruction by calling it dictum, since the need to issue such an order had not then arisen, it is especially forceful dictum when the Supreme Court specifically informs a district court what action it may take in the course of significant litigation. If it had become necessary to order the county legislators to levy taxes, there can be no doubt that the Supreme Court expected the district court to make sure that its order was enforced.

The Supreme Court has also upheld a district court's remedial order that required state and local officials to provide necessary public funds to implement a school desegregation plan. *Milliken v. Bradley,* 433 U.S. 267, 97 S.Ct. 2749, 53 L.Ed.2d 745 (1977). In *Milliken* the Court expressly rejected an immunity defense based on Eleventh Amendment sovereign immunity—a claim at least as substantial as the immunity defense now asserted by the four council members. The Court pointed out that though a state enjoyed immunity from damage actions, its immunity did not insulate it from a district court judgment requiring prospective action to comply with constitutional requirements, even when compliance would have "a direct and substantial impact on the state treasury." *Id.* at 289, 97 S.Ct. at 2762; *see also Edelman v. Jordan,* 415 U.S. 651, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). This Court has also approved an order of a district court compelling a city's legislative body to vote in favor of funds required to secure compliance with court-ordered remedies for constitutional violations. *Arthur v. Nyquist,* 712 F.2d 809 (2d Cir.1983), *cert. denied,* 466 U.S. 936, 104 S.Ct. 1907, 80 L.Ed.2d 456 (1984); *see also United States v. City of Parma, Ohio,* 661 F.2d 562 (6th Cir.1981) (requiring enactment of city ordinance), *cert. denied,* 456 U.S. 926, 102 S.Ct. 1972, 72 L.Ed.2d 441 (1982).

Indeed, in one of the cases cited to us in support of legislative immunity, *Star Distributors, Ltd. v. Marino,* 613 F.2d 4 (2d Cir.1980), we expressly distinguished litigation in which a state legislature had been enjoined "from continuing its defiance of federal court desegregation orders." *Id.* at 10 (citing *Bush v. Orleans Parish School Board,* 191 F.Supp. 871 (E.D.La.) (three-judge court), *aff'd sub nom. Denny v. Bush,* 367 U.S. 908, 81 S.Ct. 1917, 6 L.Ed. 2d 1249 (1961)). The three-judge court in *Bush* had rejected the defense of legislative immunity on the ground that the Louisiana legislature was acting in an administrative capacity, *see Bush v. Orleans Parish School Board,* 188 F.Supp. 916, 922 (E.D.La.1960) (three-judge court), *aff'd,* 365 U.S. 569, 81 S.Ct. 754, 5 L.Ed.2d 806 (1961), but our discussion of the *Bush* litigation in

*Star Distributors* makes it clear that we did not consider legislative immunity to be a defense to orders issued "to vindicate the authority of a federal court." 613 F.2d at 10.

█ On this appeal, however, we need not definitively decide whether as a general matter a district court may order city council members to vote in favor of a particular ordinance, even to implement remedies for constitutional violations. This appeal presents the more narrow issue whether such an order may be entered and enforced by contempt sanctions after a city has agreed to entry of a consent judgment committing itself to enact implementing ordinances and a city's legislative body has voted in favor of such a consent decree. On that narrow issue, we have no doubt that federal court authority must prevail. No litigant, least of all public officials sworn to uphold the Constitution of the United States, may be permitted to avoid compliance with solemn commitments they have made in a consent judgment entered by a federal district court to remedy constitutional violations. Without intending to cast doubt on a district court's authority to order legislative action in contested litigation concerning the appropriate choice of remedies for constitutional violations, we note that the Supreme Court has recently observed that consent judgments may contain enforceable obligations that might have been beyond the authority of a district court to enter in contested litigation. *See Local No. 93, Int'l Ass'n of Firefighters v. City of Cleveland,* 478 U.S. 501, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986).

█ Nor is there any merit in appellant Spallone's suggestion that he may not be required to implement the Consent Judgment because he voted against its approval as a member of the City Council. A federal court must be able to rely upon the assurances given by municipalities and their legislative bodies, without regard to the dissenting votes of individual local officials. Once the Yonkers City Council approved the terms of the Consent Judgment, the Council became obligated to carrying out its commitments. If a member of the Council is unwilling to abide by such commitments, his option is to decline to serve on the body that is bound, not to act in defiant disregard of the commitments and the federal court judgment that memorializes them.

Whatever the scope of local legislators' immunity, it does not insulate them from compliance with a consent judgment to which their city has agreed and which has been approved by their legislative body.

5. First Amendment

█ The council members' assertion of a First Amendment defense to the July 26 order and its enforcement requires no extended discussion. Even if we acknowledge that the act of voting has sufficient expressive content to be accorded some First Amendment protection as symbolic speech, the public interest in obtaining compliance with federal court judgments that remedy constitutional violations unquestionably justifies whatever burden on expression has occurred. *See United States v. O'Brien,* 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968). The council members remain free to express their views on all aspects of housing in Yonkers. But just as the First Amendment would not permit them to incite violation of federal law, *see Brandenburg v. Ohio,* 395 U.S. 444, 447, 89 S.Ct. 1827, 1829, 23 L.Ed.2d 430 (1969) (per curiam); *Dennis v. United States,* 341 U.S. 494, 71 S.Ct. 857, 95 L.Ed. 1137 (1951), it does not permit them to take action in violation of such law.

B. *The City*

To the extent that the City advances the same objections as the council members, particularly the contention that the District Court should have chosen to adopt the Affordable Housing Ordinance itself or to appoint a commission to exercise the City's housing functions, we need not repeat our reasons for rejecting those objections. Three contentions, however, require further discussion.

1. Defense of Impossibility

 The claim most vigorously pressed by the City is the defense of impossibility. The City contends that enactment of the Affordable Housing Ordinance requires an affirmative vote of a majority of the City Council and that the City, as a corporate entity, is powerless to compel the council members to act. We recognize that civil contempt sanctions may not be imposed upon a person or entity unable to comply with a court's orders. *See Shillitani v. United States, supra,* 384 U.S. at 371, 86 S.Ct. at 1536; *Maggio v. Zeitz,* 333 U.S. 56, 76, 68 S.Ct. 401, 411, 92 L.Ed. 476 (1948). Nevertheless, we conclude that the City's defense of impossibility is unavailing.

Preliminarily, we have some doubt whether the City has done everything it can, apart from securing the favorable votes of a Council majority, to obtain compliance with the orders of the District Court. The City has not requested the Governor of New York to use whatever authority he may have to remove local officials for misconduct, nor has the City requested the New York Emergency Financial Control Board for the City of Yonkers to take whatever action its broad authorizing statute permits it to take under the current circumstances, 1984 N.Y.Laws ch. 103.

 More fundamentally, we agree with the position urged by the United States that the City cannot view itself as an entity separate from the City Council for purposes of complying with the Consent Judgment. The City bound itself to take necessary legislative action when it agreed to the Consent Judgment, which explicitly calls for implementing legislation. Having made that commitment, the City may properly be subjected to the coercive force of civil contempt sanctions until compliance with its commitment occurs. The suggestion that the administrative officials of the City are willing to comply but cannot take legislative action conjures up a scheme of separated powers that does not obtain in Yonkers. For purposes of taking official governmental action, the City of Yonkers is the City Council and vice versa.

The Council sets municipal policy, *see Pembaur v. City of Cincinnati,* 475 U.S. 469, 481, 106 S.Ct. 1292, 1299, 89 L.Ed.2d 452 (1986) ("where action is directed by those who establish governmental policy, the municipality is equally responsible" with city's authorized decisionmakers), it appoints and can replace the city manager, and it is the principal agency of governance for the City. There is not even a separately elected executive authority. The mayor is a council member elected to the Council in a citywide election; the other council members are elected from districts. Under the circumstances of this case, the Council's defiance of the Consent Judgment and the implementing orders of the District Court is the defiance of the City, and the City, along with the defiant council members, may be subject to civil contempt sanctions. As the Supreme Court has observed, "If a state agency refuses to adhere to a court order, a financial penalty may be the most effective means of insuring compliance." *Hutto v. Finney,* 437 U.S. 678, 691, 98 S.Ct. 2565, 2573, 57 L.Ed.2d 522 (1978). The same may be said of a city.

 The City further contends that even if it can legally be held in civil contempt because of the violation of the July 26 order, it was an abuse of discretion to do so under the circumstances here presented, especially since the District Court had available the alternative of ordering the Affordable Housing Ordinance into effect. We conclude, however, that the District Court neither erred as a matter of law nor exceeded its permissible discretion by using contempt sanctions to coerce the City to fulfill commitments that it had undertaken in the Consent Judgment or by determining that such sanctions were necessary to achieve enactment of the Ordinance.

2. State Law Objection

 The City asserts a state law objection different from the council members' claim concerning notice and hearing requirements for zoning changes. The City contends that it lacks the authority under state law to grant the tax abatements re-

quired by the Long Term Plan Order. It acknowledges some authority to grant tax abatements, *see* N.Y.Real Prop.Tax Law § 421–c (McKinney 1984), but contends that the Long Term Plan Order requires tax abatements permissible only for cities of more than one million population, *id.* § 421–a(2)(a).

We cannot be certain whether the District Court, in issuing the Long Term Plan Order, intended to override state law in the belief that the specified tax abatements were necessary to remedy the violations that have occurred or intended to require only those tax abatements consistent with state law. The Court clearly had the power to override state law to implement its judgment, but we are not certain that it intended to use such power. We need not resolve the uncertainty at this time, however, because the City's challenge is to the provisions of the Long Term Plan Order, not the Affordable Housing Ordinance, which is the subject of the pending contempt adjudication. The Ordinance refers to tax abatements but does not implement them. *See* proposed Affordable Housing Ordinance § 2(a) n. *. Under the circumstances, we will not disturb the contempt adjudication but will grant leave to the City to seek clarification from the District Court whether it intends to order tax abatements that override state law or only such abatements as are consistent with state law.

3. The Amount of the Monetary Sanctions

■ The City contends that the amount of the coercive fines imposed as a remedial sanction for civil contempt is excessive and a violation of the Due Process Clause of the Fifth Amendment and the Excessive Fines Clause of the Eighth Amendment. The fines start at $100 a day and double each day of continued noncompliance. As a result of doubling, the fine exceeds $100,-000 for day 15, exceeds $1 million for day 21, and exceeds $1 billion for day 25.

The Supreme Court has stated that the Eighth Amendment is "designed to protect those convicted of crimes." *Ingraham v. Wright*, 430 U.S. 651, 664, 97 S.Ct. 1401, 1408, 51 L.Ed.2d 711 (1977). More recently

the Court has raised the possibility that the Amendment might have some application beyond the criminal context; the Court characterized as a "cognizable constitutional challenge" a claim that the Excessive Fines Clause applies to the amount of punitive damages that may be awarded in civil cases, *Bankers Life and Casualty Co. v. Crenshaw*, —— U.S. ——, 108 S.Ct. 1645, 1650, 100 L.Ed.2d 62 (1988), but declined to decide the issue because it had not been preserved for review as a federal question, *id.*

■ Even if the Excessive Fines Clause should be determined to apply to punitive damages, it does not apply to civil contempt sanctions imposed to obtain compliance with court orders. We have already held that the Cruel and Unusual Punishments Clause does not apply to coercive imprisonment imposed as a civil contempt sanction, *United States v. Dien*, 598 F.2d 743, 745 (2d Cir.1979), and the reasoning of *Dien* applies to the Excessive Fines Clause. Both clauses apply to sanctions imposed to punish past conduct, not to sanctions imposed to secure prospective compliance.

■ The inapplicability of the Excessive Fines Clause, however, does not mean that civil contempt sanctions are subject to no limitation. The Due Process Clause is an arguable limitation, though it is debatable whether a person has been "deprived" of property within the meaning of the Fifth Amendment when that person always has the option of complying with the order of the court and thereby terminating the obligation to pay the coercive fine. In any event, the law of contempt itself exerts some outer limits on the normally "wide discretion" of a district court to fashion appropriate remedies to secure compliance with its lawful orders. *See Vuitton et Fils S.A. v. Carousel Handbags*, 592 F.2d 126, 130 (2d Cir.1979); *see also Perfect Fit Industries, Inc. v. Acme Quilting Co.*, 673 F.2d 53, 57 (2d Cir.) (level of corporate profits relevant in determining whether coercive fine is "confiscatory"), *cert. denied*, 459 U.S. 832, 103 S.Ct. 73, 74 L.Ed.2d 71 (1982).

The fact that a coercive monetary sanction requires payment of a large daily fine does not necessarily render that sanction beyond the discretion of a district court. The Supreme Court has itself selected as an appropriate sanction a coercive fine of $2,800,000 (in 1947 dollars) to be imposed upon a union if it should fail to comply with a district court order within five days. *United States v. United Mine Workers*, 330 U.S. 258, 305, 67 S.Ct. 677, 702, 91 L.Ed. 884 (1947). We have declined to disturb by mandamus the imposition of a coercive fine that started and remained constant at the level of $150,000 per day. *International Business Machines Corp. v. United States*, 493 F.2d 112 (2d Cir.1973), *cert. denied*, 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974).

The City of Yonkers has an annual budget of $337 million. The need for a substantial daily fine to coerce compliance is demonstrated by the City's announcement to the District Court of its willingness to pay $30 million to be relieved of its commitment to build the 200 units of public housing. Obviously, the City believes that there is a price it is willing to pay to avoid compliance with the orders of the District Court. The District Court was entitled to establish a schedule of fines that would secure compliance with its orders, and under the circumstances of this case that schedule would have to reach, without undue delay, a cumulative fine significantly above the price the City was willing to pay for noncompliance. The Court acted well within its discretion in starting the fine schedule at $100 a day. The Court also was entitled within reasonable limits to double the amount of the fine for each day of continued defiance. At that rate the cumulative fine after seven days, when we issued our stay, was $12,700. At some point, however, the doubling reaches unreasonable proportions. Under the current schedule the fine for day 25 is more than $1 billion; the fine for day 30 is more than $50 billion.

We believe that the doubling exceeds the bounds of the District Court's discretion when the level of each day's fine exceeds $1 million. The present schedule calls for a fine of more than $800,000 on day 14. We will therefore modify the contempt sanction against the City to provide that the fine shall be $1 million per day on day 15 and $1 million per day for every subsequent day of noncompliance.

### Conclusion

We affirm the contempt sanctions against the four council members, Spallone, Chema, Longo, and Fagan. We modify the contempt sanction against the City of Yonkers so that the fine is $1 million per day on day 15 and $1 million per day for every subsequent day of noncompliance, and we affirm the sanctions against the City, as modified. We deny the pending motion to stay the District Court's order of July 26. We direct that issuance of our mandate be stayed for seven days from the date of this decision to permit application to the Supreme Court or a Justice thereof for a stay of the contempt sanctions pending filing and consideration of a petition for a writ of certiorari. Unless a stay is granted by the Supreme Court or a Justice thereof, our mandate shall issue seven days from the date of this decision and our prior stay of the contempt sanctions shall at that time be vacated. On the date our mandate issues, the fines against each of the four council members shall resume at the level of $500 per day and, if noncompliance continues, each shall be imprisoned, pursuant to paragraph 5 of the Order of July 26, two days after the date our mandate issues. Since our stay entered on August 9 and the District Court's Order directed imprisonment to occur on August 11, it is appropriate to adjust the incarceration timetable in light of the interval between the issuance of our stay and the vacation of that stay upon issuance of our mandate. Also on the date our mandate issues, the fines against the City shall resume at the level for day 8 of the schedule resulting from the District Court's Order of July 26 and, if noncompliance continues, shall double until day 14, shall be $1 million on day 15, and shall be $1 million per day for every subsequent day of noncompliance.

Affirmed as to the council members; affirmed, as modified, as to the City.