885 F.2d 864
 50 Fair Empl.Prac.Cas. 1288
 Unpublished Disposition
NOTICE: Fourth Circuit I.O.P. 36.6 states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Fourth Circuit.
Bertram DRAYTON, Plaintiff-Appellant,
v.
The MAYOR AND COUNCIL OF ROCKVILLE, Defendant-Appellee,
Equal Employment Opportunity Commission, Amicus Curiae.
 No. 89-3209.
 United States Court of Appeals, Fourth Circuit.
 Argued June 8, 1989.
Decided Sept. 15, 1989.
 
 Albert David Brault (Regina A. Casey, Brault, Graham, Scott & Brault on brief) for appellant.
 Carolyn L. Wheeler (Charles A. Shanor, General Counsel, Gwendolyn Young Reams, Associate General Counsel, Lorraine C. Davis, Assistant General Counsel, Equal Employment Opportunity Commission on brief) for amicus curiae.
 Francis Raymond Laws (Stanley Mazaroff, Venable, Baetjer & Howard on brief) for appellee.
 Before ERVIN, Chief Judge, JAMES R. SPENCER, United States District Judge for the Eastern District of Virginia, sitting by designation, and WALTER E. HOFFMAN, Senior United States District Judge for the Eastern District of Virginia, sitting by designation.
 ERVIN, Chief Judge:
 
 
 1
 Bertram Drayton, erstwhile Director of Community Resources for the City of Rockville, Maryland ("Rockville" or "the city"), sought damages from Rockville on wrongful discharge and discrimination theories. The district court, viewing the suit as a challenge to a budgetary decision by Rockville's council, held Drayton's claims barred by absolute legislative immunity. The court also addressed the merits, concluding that no sound evidence supported Drayton's charges of racial or age discrimination or of breach of contract. We affirm the disposition on the merits, and therefore do not address the applicability of legislative immunity to the case.
 
 I.
 A.
 
 2
 Rockville's elected officials are its mayor and four council members, each of whom serves a two-year term. These officials appoint a city manager as the city's executive officer. City department heads report directly to the city manager.
 
 
 3
 In September, 1985, Larry Blick resigned as Rockville's city manager. With Daniel Hobbs serving as acting manager, the city began a nationwide search for Blick's successor. On February 18, 1986, Richard Robinson assumed his duties as Rockville's new manager.
 
 
 4
 Robinson's first tasks were to review the city's management structure and draft a proposed budget. Robinson's management review proposed the elimination of two senior staff jobs, those of Director of Community Resources (DCR), a post then held by Drayton, a fifty-nine year old black man, and of Assistant City Manager, to which Hobbs, a white man under forty, had returned after Robinson's accession. The mayor and council adopted Robinson's employee pay and classification proposal and authorized Robinson to implement it forthwith.
 
 
 5
 Drayton alleges that the elimination of his job, ostensibly part of a necessary retrenchment, traces to Rockville officials' hostility toward his race and age. Our history of the dispute surveys primarily the evidence of Rockville's motives in ousting Drayton, evidence that convinces us that considerations of race and age did not influence the city's calculations improperly.
 
 
 6
 Rockville hired Drayton in 1971. Drayton rose quickly through the ranks, accumulating plaudits for dedication and resourcefulness at each stage.[1] In 1978, Drayton became DCR, with responsibility for a variety of social services programs as well as the LPCC.
 
 
 7
 While Drayton appears to have found favor with many of Rockville's citizens, a number of Rockville officials criticized Drayton's management and discretion. Two of the charges alleged professional improprieties, or their appearance, reflecting aspects of Drayton's personal life. Though Drayton began a program to provide free income tax preparation assistance to the public, including young people, it appears undisputed that Drayton filed no personal income tax returns between 1975-82.[2] In 1985, Sonia Riley, a woman Drayton had hired to work in the Department of Community Resources after a sexual relationship between the two had ended, complained that her poor performance evaluations were Drayton's retaliation for her refusal to sleep with him.[3]
 
 
 8
 There is no genuine dispute that Drayton's budgetary skills were deficient and that his department was in a near-adversarial relationship with Rockville police. Blick, otherwise a Drayton supporter, noted a need for improvement in Drayton's management of financial and material resources.[4] Hobbs agreed that Drayton was "weak or needed improvement in managing financial material resources", but indicated that he and Blick perceived Drayton as especially, and perhaps uniquely, qualified to serve the needs of his constituents and as "the conscience of the organization (i.e. Rockville government).
 
 
 9
 Other officials went further. Carol Kachadoorian, Rockville's City Clerk, stated that Drayton's refusal to use another department's budget system had led to LPCC's deterioration and that Drayton was generally "a poor manager."[5] Ellen Elow-Mintz, a budget analyst for the city, noted "alarming problems in the way Drayton handled expenditures" and numerous violations of procedures in the administration of an emergency assistance program for which Drayton was responsible. James Coyle, a member of Rockville's Human Rights Commission from 1982-85 and later a Councilman, complained to Blick about Drayton's mismanagement of the Commission, and suggests that he had Drayton's ouster as DCR in mind as he interviewed Robinson and other candidates for city manager in 1986.[6]
 
 
 10
 Drayton's management of the LPCC led to increasing friction between his and the police departments.[7] John Miller, a captain in the Rockville police department since 1981, related several incidents that had contributed to friction in the couple of years before Drayton lost his job. In April, 1986, Miller spoke to Drayton about a reported theft of a videocassette recorder from the LPCC. An aide to the city manager had told Miller of the theft, which Drayton had not reported.
 
 
 11
 Drayton said the theft had taken place about a month ago and that he had "put the word out" to have it returned. The theft had actually occurred on December 17, 1985. Miller had a police report on the theft prepared after he spoke with Drayton but the recorder, valued at $359.00, never turned up. Drayton's failure to report the theft apparently flouted city policy; Police Chief Stout's January, 1986, memorandum asked whether it was "acceptable City policy to give [LPCC] staff the discretion to decide whether they will report criminal acts when they occur within the Center?"
 
 
 12
 We find undisputed as well allegations that Drayton and his staff more actively interfered with police operations. After a fight broke out between youths attending a dance at the LPCC, Drayton called the police. The fight had ended by the time the first officer arrived; Miller's affidavit states that, for reasons unknown, "Drayton confronted the officer at the dance, yelling at her in front of the youths at the dance." On another occasion, Drayton stepped in between an officer and some people the officer had asked to stop drinking in front of the LPCC. Though drinking is illegal at that site, Miller reports that Drayton "told the officer to leave the individuals alone."
 
 
 13
 In July, 1985, the police department began a daytime foot patrol program in the Lincoln Park Community. The purpose of the program was to improve relations, described by another officer as "strained", between police and community, as well as to reduce crime. The LPCC staff declared that they would report nothing to police other than personal injury and serious property crimes. Along the same lines, Chief Stout's memorandum inquired whether it was acceptable policy to allow LPCC staff to decline to identify persons at the LPCC when asked to do so by officers trying to serve arrest warrants, and whether LPCC staff acted according to policy in refusing to cooperate with criminal investigations, particularly of persons using or dealing in drugs.
 
 
 14
 As we have indicated, these matters were on the minds of those charged with selecting Blick's successor. In April, 1986, shortly after Robinson took office, Coyle relates that at a three-day management meeting of Robinson and the Council, other Council members and Robinson agreed with him that "Drayton was not capable of handling his management position." The recollection of Steven Van Grack, then Rockville's mayor, is the same, "that the members of the Council as well as [Robinson] were in general agreement that Mr. Drayton was not a good manager and should not be placed in a position of high responsibility." Robinson then told the Council that he intended to eliminate Drayton's job, and that he did not want to assign Drayton a high-level job in the reorganized Community Resources department.
 
 
 15
 The axe was not long in falling. In a series of three memoranda dated May 20, 1986, Robinson and Drayton alluded to an earlier meeting at which Robinson had offered Drayton the options of retiring in September, 1986, or hanging on until Robinson carried through with his intention to eliminate the DCR. "Should you not retire", states the last memorandum from Robinson to Drayton, "after the job is eliminated, a full investigation will be conducted. Either way, you will be no longer in the employ of the City of Rockville."
 
 
 16
 A letter dated June 4, 1986, notified Drayton that his job had been eliminated.[8] The letter stated that Drayton would remain on Rockville's payroll until September 30, 1986, and that Drayton could in the meantime apply for other positions with the city. Drayton then elected to retire as of October 1, 1986.
 
 
 17
 Rockville satisfied its promise to retain Drayton on the payroll through September, 1986, and allowed Drayton to use some of its facilities to look for a new job. Though Drayton contacted many prospective employers, he has been unable to secure a position similar to that he held with Rockville and now works as a security guard.[9]
 
 B.
 
 18
 Drayton commenced this action in Maryland state court with claims under the Age Discrimination in Employment Act of 1967 (ADEA), as amended, 29 U.S.C. Secs. 621-634 (1982) and Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. Secs. 2000e-2000e-17 (1982) as well as state law claims of wrongful discharge and breach of contract. Rockville removed the action to the District of Maryland.[10]
 
 
 19
 Following removal, Rockville moved to dismiss or, in the alternative, for summary judgment on the state law claims. The district court, finding Maryland's antidiscrimination statutes to provide the exclusive remedy for race and age discrimination, dismissed the wrongful discharge claim but denied the motions as to the breach of contract claim. The court then allowed Drayton's motion to amend the complaint to add claims under 42 U.S.C. Sec. 1983 and Sec. 1985(3), but, in a decision Drayton has not appealed, refused to allow the addition of Robinson as a defendant.
 
 
 20
 Rockville moved for summary judgment on all claims at the close of discovery. The district court granted the motion, holding that legislative immunity barred the federal claims and that no breach of contract had occurred as a matter of Maryland law. The court further concluded that the evidence offered ample support for the argument that Drayton had not met Rockville's legitimate expectations, and hence did not support claims of racial or age discrimination. Drayton appeals both holdings.[11]
 
 II.
 
 21
 We agree with the district court that Drayton has not made out a prima facie case of racial or age discrimination, because the evidence makes plain that Drayton did not meet Rockville's legitimate expectations in the period preceding his discharge. Drayton, a black man over forty years old, was in the class protected by the ADEA and Title VII. See E.E.O.C. v. Western Electric Co., 713 F.2d 1011, 1014 (4th Cir.1983) (presenting the four elements of a Title VII or ADEA plaintiff's prima facie case). We have determined that Drayton was discharged, and will assume what the evidence leaves ambiguous, that the result of Rockville's governmental reorganization was to place the responsibilities formerly committed to the DCR in the hands of white men under forty. With three of the four elements of Drayton's prima facie case met, we must consider whether " 'but for' [Rockville's] motive to discriminate ... he would not have been terminated." English v. Pabst Brewing Co., 828 F.2d 1047, 1051 (4th Cir.1987), cert. denied, 108 S.Ct. 2037 (1988) (quoting Wilhelm v. Blue Bell, Inc., 773 F.2d 1429, 1432 (4th Cir.1985).
 
 
 22
 The uncontroverted evidence that Drayton was a poor manager who had filed no income tax returns over a seven-year period and who had aggravated, or at least failed to curb, serious tensions between his staff and a coordinate department is sufficient proof of a legitimate basis to fire Drayton.[12] Even Blick and Hobbs, Drayton's most prominent supporters, concede that Drayton lacked management and financial skills. It is not our place to conclude that Robinson and the Council ought to have agreed with Blick and Hobbs that Drayton's professional virtues outweighed his deficiencies.
 
 
 23
 We also believe that Rockville could legitimately expect a city department head, one in charge of a program to help citizens prepare their tax forms, to file returns himself. The uncontroverted evidence of a rift between the Police and Community Resources Departments that thwarted effective police operations and threatened to amplify racial tensions in a sensitive community further convinces us that Rockville had a bundle of legitimate objections to the way Drayton handled his job. So convinced, we see no genuine issue allowing Drayton to avoid summary judgment on his Title VII and ADEA claims.[13]
 
 
 24
 As for Drayton's Sec. 1983 and Sec. 1985 claims, our conclusion that no discrimination inhered in Rockville's actions implies that the city violated none of Drayton's rights under the equal protection clause of the Fourteenth Amendment.
 
 
 25
 We attend last to Drayton's allegations that his discharge was wrongful and a breach of contract under Maryland law. In Parlato v. Abbott Laboratories, 850 F.2d 203 (4th Cir.1988), we held that the proper avenue under Maryland law for a plaintiff alleging a termination infected by racial or age discrimination is the statutory remedy created in Md.Ann.Code art. 49B. Because the Article 49B remedy is exclusive, the district court was correct to dismiss Drayton's wrongful discharge claim.
 
 
 26
 Rockville ordinances permit the city manager to discharge a civil service employee such as Drayton only "for such cause as will promote the efficiency of the service." A city employee's supervisor ought, whenever possible, to precede formal discipline with an oral or written warning with sufficient time for improvement, and must give prior written notice of the reasons for dismissal. Robinson concedes that he did not tell Drayton that he and the Council had serious misgivings about his performance, did not place written reprimands in Drayton's personnel file and did not offer Drayton time to improve. So far as we can tell, no writing laid out to Drayton the reasons for his discharge.
 
 
 27
 These omissions, Drayton believes, amount to a breach of a contract formed by the representations in Rockville's personnel ordinances. We assume Drayton is correct but conclude with the district court that Drayton chose here, as with his other claim, an improper forum to pursue his grievances. The ordinances complement the guarantees on which Drayton relies with a detailed appeals procedure available to a civil servant who has been "the subject of dismissal or other disciplinary action...." Drayton knew of but failed to avail himself of the appeals procedure. Quesenberry v. Washington Suburban Sanitary Comm'n, 535 A.2d 481, 484 (Md.1988) and Dearden v. Liberty Medical Center, 542 A.2d 383, 385 (Md.App.1988) state Maryland's longstanding rule that an employee must exhaust his contractual remedies before filing suit against his employer. With no argument offered that Maryland would allow Drayton to depart from the rule, it is a simple matter to hold that Drayton's failure to exhaust his remedies under the ordinances bars assertion of his breach of contract claim in this action.
 
 
 28
 Our affirmance of the grant of summary judgment to Rockville on the merits makes it unnecessary for us to address the district court's legislative immunity analysis.
 
 III.
 
 29
 For the foregoing reasons, we agree that summary judgment was appropriate on the merits of Drayton's claims, and therefore affirm.
 
 
 30
 AFFIRMED.
 
 
 
 [1]
 Accolades came from both citizens and city officials. On November 11, 1974, Blick notified the Council that Drayton, then Community Recreation Director at Rockville's Lincoln Park Community Center (LPCC), deserved a special award for community service and for his service as an " 'Ambassador of Goodwill' for our City government ... within the community he serves." The documents before us note other official commendations, as well as a number of kudoes from citizens and civic groups. As late as April 12, 1985, Blick wrote Drayton commending him for helping a family that had lost their home in a fire
 Not all reviews of Drayton's department were favorable, however. In an "Open Letter from the Lincoln Park Community" to Drayton and the Council dated May 28, 1985, citizens complained that "[o]ver the past three years, a vast majority of Lincoln Park residents ... have complained that the crowds and conduct of the people who hang around the [LPCC] has become loud, profane, disorderly and sometimes outrageous" and that Community Day, a city-sponsored festival, brought more harm than good to the community.
 
 
 [2]
 A deposition before us indicates that amounts withheld from Drayton's salary satisfied about 80% of Drayton's federal income tax obligation for the period, but that Drayton still owed $30,000.00 or more, much of it for interest and penalties on the unpaid tax. The deponent, Thomas M. McCartin, stated that he understood "there were several demands on [Drayton's] time and tragic events that occurred to his family, close members of his family who depended on him financially, they occurred at very inconvenient times and he kept assisting them and did not get around to filing those returns."
 
 
 [3]
 The May 1, 1986 report of an investigation of Riley's charges by Sondra Harans Block, Rockville's Assistant City Attorney, and Robert Johnson, Director of Personnel, concluded that the evidence was insufficient to support Riley's allegations of sexual harassment. The investigators also found that, although possibly a poor management step, Riley's hiring and firing were unrelated to her personal relationship with Drayton, and that a more thorough investigation would be necessary to warrant exploring rumors that Drayton solicited sexual favors in exchange for public assistance
 
 
 [4]
 An affidavit from Blick, dated November 22, 1988, stated that while Blick had pointed out areas in which Drayton needed to improve, he at no time impressed Drayton that his job depended on improvement and "believed that [Drayton's] weaknesses were offset by his contributions to the City."
 
 
 [5]
 Kachadoorian's July 23, 1986, report to Robinson, prepared after Drayton's departure, cited Draytons' weak management abilities, "tendency to interpret laws and standards as loosely or as rigidly as a ... circumstance required", nepotism at the LPCC, and irregularities in a grant award as pertinent findings from her review of activities in Drayton's former department
 
 
 [6]
 Coyle's affidavit also recounts that "Blick told me that he had his own concerns about Drayton's performance and support for the Human Rights Commission." Coyle states, naturally, that his appraisal had nothing to do with Drayton's race or age and that he thought Drayton should be able to apply for a city job "at a lower level ... commensurate with his abilities."
 
 
 [7]
 We infer that Lincoln Park is home to many of Rockville's black citizens, and that the police department was concerned about reducing perceptions of police racism on the part of Lincoln Park residents. The May 28, 1985, letter from Lincoln Park residents to Drayton and the Council indicates that while residents chafed at the disorderly behavior of some who frequented the LPCC, "[t]hey didn't feel that calling the police would make any real difference, and in fact may even have made matters worse...." A January 6, 1986, memorandum from Rockville Police Chief Jared Stout to acting city manager Hobbs described the tensions between police and the LPCC staff and suggested that the staff "automatically ascribe[d] racist attitudes to [police] behaviors arising out of gaps in procedures or unclear policies."
 
 
 [8]
 We do not find a copy of the June 4 letter in the documents before us. Both parties, however, refer to its existence and characterize it as a notice of job elimination. On June 9, 1986, the council adopted Robinson's proposed personnel classification and pay system. The system eliminated the Department of Community Resources as of July 1, 1986
 
 
 [9]
 Momentous as his tenure was for Drayton, Robinson, discharged on November 16, 1987, was not for long a feature of Rockville government
 
 
 [10]
 The defendant in this action is the City of Rockville as such, and not its mayor or council members. The designation "The Mayor and Council of Rockville" is proper to identify the City as defendant. United States v. City of Yonkers, 856 F.2d 444, 458 (2d Cir.1988)
 
 
 [11]
 The Equal Employment Opportunity Commission briefed and argued the case before us as an amicus curiae in support of Drayton's opposition to the application of legislative immunity
 
 
 [12]
 We shall ignore the disputed allegations of sexual harassment and solicitation of sexual favors, as well as the protestations of Rockville officials that their deliberations on Drayton's fate were free of any racial or age bias
 
 
 [13]
 Our decision implies nothing about the merits of the several actions commenced by other black Rockville officials discharged after Drayton. We conclude only that the evidence in this case does not reveal a decision dependent on Drayton's race or age